# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-002

Filing Date: November 19, 2020

No. S-1-SC-36502

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**RICARDO MARTINEZ,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**T. Glenn Ellington, District Judge**

Released for Publication January 26, 2021.

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Eran Shemuel Sharon, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VIGIL, Chief Justice.**

**{1}** Convicted of two counts of murder in the first degree, Defendant Ricardo Martinez seeks reversal and a new trial on grounds that the district court erred by (1) denying his motion to suppress out-of-court and in-court identification testimony, (2) excluding witness testimony, thereby depriving him of the ability to present a complete defense, (3) admitting prior bad acts evidence under Rule 11-404(B) NMRA, and (4) refusing to charge the jury in accordance with his requested instructions on the use of informant testimony.

**{2}** With respect to the eyewitness identification issue, Defendant challenges the continued viability of the prevailing federal rule, as articulated in *Manson v. Brathwaite*, 432 U.S. 98 (1977), governing the admission of identification evidence. Under *Manson*, courts apply a two-part test to determine the admissibility of eyewitness identification evidence, addressing first whether police identification procedures were "unnecessarily suggestive" and, if so, weighing specified factors in deciding the "linchpin" issue of whether the eyewitness identification was nonetheless sufficiently reliable to satisfy federal due process requirements. *See id.* at 113-14. Although the *Manson* reliability test has been widely adopted among state courts, including our own, *see, e.g.*, *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 20, 130 N.M. 179, 21 P.3d 1032; *State v. Baca*, 1983-NMSC-049, ¶ 18, 99 N.M. 754, 664 P.2d 360, it has come to face ever-increasing criticism from legal scholars as a result of major advances in scientific knowledge of eyewitness memory, perception, and recall, knowledge that contradicts many of the analytical assumptions underlying the rule.

**{3}** In light of the significant, recurrent, and deeply troubling problems caused by unnecessarily suggestive, police-arranged identification procedures, we take this opportunity to consider our state constitutional jurisprudence as it relates to the admission of this type of powerful yet problematic evidence in New Mexico courts. We ultimately hold that the *Manson* test does not satisfy due process under Article II, Section 18 of the New Mexico Constitution, and we adopt standards that must be satisfied before such evidence is admissible.

**{4}** Although we agree with Defendant that Article II, Section 18 of the New Mexico Constitution requires departure from the existing federal *Manson* rule, we affirm the district court order denying his motion to suppress because (a) the identification procedures used were not impermissibly suggestive under existing federal standards, and (b) the evidence presented by Defendant failed to establish prima facie that some aspect of the identification procedure used was suggestive in nature under our newly-adopted standards. We also affirm on the remaining issues.

## I. BACKGROUND

### A. The Homicide of Cisneros and AO

**{5}** Eighteen-year-old Venancio Cisneros and his thirteen-year-old girlfriend AO had been shot when they were discovered in Cisneros's car off a dirt road in Santa Fe on October 25, 2014. A Santa Fe County Sheriff's Deputy responding to a medical assist call based on information that two individuals in a vehicle were unresponsive found Cisneros and AO, who were deceased when the deputy arrived. Autopsies indicated that gunshot wounds to the head were the cause of death of both victims. The autopsies also indicated that the victims' wounds were consistent with gunshots fired at them by someone sitting in the back seat of the car. The pathologist could not provide a precise time of death but stated that the homicides could have occurred after 2:00 p.m. on October 24, 2014.

### B. The Investigation

**{6}** On November 3, 2014, Santa Fe County Sheriff's Office Detective David Jaramillo received a call from Cisneros's mother. She told Detective Jaramillo that she met a potential eyewitness named Emilio Benitez and provided Detective Jaramillo with Benitez's contact information. Detective Jaramillo contacted Benitez shortly after receiving this phone call and arranged to speak with him. During their conversation, Benitez confirmed that he witnessed someone walking away from Cisneros's vehicle on October 24, 2014. Later on the same day, Benitez met with Detective Jaramillo and other police officers at the crime scene to describe what he saw on the day of the shooting. Detective Jaramillo recorded his interview with Benitez. Benitez stated that while he was parked in front of his friend's house, he witnessed a car, later identified as Cisneros's vehicle, arrive and park at the location where Cisneros and AO were found dead. Benitez said he did not see how many people were in the car when it arrived. Benitez said that soon thereafter, he drove back to his house, which was about two blocks away, to pick up a battery charger to start a truck at his friend's house. As he drove home, Benitez said he heard two gunshots. When Benitez arrived back at his friend's house about ten to fifteen minutes later, he said he witnessed someone about fifty yards away walking away from Cisneros's vehicle and that he was able to look straight at this person for a few seconds. Benitez stated that all of this occurred between 1:30 p.m. and 2:00 p.m. on October 24, 2014.

**{7}** Benitez gave the officers a physical description of the individual he saw. Benitez described the individual as being young, skinny, and with skin that was a "little dark" and as having neck and arm tattoos. He also stated that the individual's hair was about two inches long and that the individual had a moustache and short goatee. Benitez told the officers that he did not have good eyesight but that he could recognize the person he saw if he was shown a picture. After Detective Jaramillo stopped recording his interaction with Benitez, they continued to talk. Benitez testified that at this time, Detective Jaramillo showed him five or six "jail photos" of different individuals, including a picture of Defendant, as Benitez sat in Detective Jaramillo's vehicle. Detective Jaramillo disputed showing Benitez photos at this time. Benitez testified that Detective Jaramillo asked him whether he recognized the person he saw at the scene in any of the photographs he was shown. Benitez further testified that he identified the person he saw at the scene of the shooting as one of the individuals in the photos presented to him by Detective Jaramillo.

**{8}** On November 3, 2014, Detective Jaramillo interviewed Defendant's friend Jesus Rodriguez. After this interview, Rodriguez contacted Defendant. He told Defendant that the police suspected that he and Defendant murdered Cisneros and AO. Rodriguez also told Defendant that during the interview, the officers had a picture of Defendant. Upon learning that he was a suspect, Defendant left Santa Fe and traveled to Colorado Springs, Colorado, with his uncle Melicendro Martinez.

**{9}** Detective Jaramillo assembled a photo array and requested that Benitez come to the sheriff's office to view the array on November 5, 2014. The array was composed of six photographs—some of which were apparently the same photos shown to Benitez two days before as well as some photos that were new to him. During the presentation of the photo array, Benitez identified a photo of the person he saw at the scene of the

shooting. Benitez stated that the photograph was of the same individual who he identified at the scene of the shooting as the person he saw walking away from Cisneros's car on October 24, 2014. This was a photograph of Defendant.

**{10}**	Based on Benitez's identification, Detective Jaramillo prepared an arrest warrant for Defendant and a search warrant for Defendant's residence, DNA, and phone records. Police executed the search warrant for Defendant's residence on November 7, 2014, and collected five cell phones and a smoking pipe.

**{11}**	On November 12, 2014, the Santa Fe County Sheriff's Office received a crime stoppers tip that Defendant could be found at an apartment in Colorado Springs. In collaboration with the United States Marshals and the Colorado Springs Police Department, Defendant's location in Colorado Springs was confirmed. Defendant and Melicendro were both arrested on November 15, 2014.

**{12}**	Two days later, on November 17, 2014, Detective Jaramillo interviewed Defendant at the El Paso County Detention Center in Colorado Springs. Defendant stated that he did not know Cisneros or AO well, that he had met them through friends, and that he had only known Cisneros for three or four months. Defendant admitted that he and Melicendro got into Cisneros's car on the day of the shooting; however, Defendant consistently asserted that he did not know who killed Cisneros and AO or why it happened. Defendant stated that while he was in the car, Cisneros dropped Melicendro off at his girlfriend's house. Defendant asserted that soon afterwards Cisneros dropped him off at the house of his friend Gilbert or at Shantel's house.

**{13}**	On December 9, 2014, Defendant asked to speak with police again to see what evidence they had against him. Defendant continued to assert that he was innocent and that he did not know who killed Cisneros and AO.

## C.	Pretrial Litigation

**{14}**	Defendant filed a motion to suppress the photo identification and any subsequent in-court identification under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article II, Sections 14 and 18 of the New Mexico Constitution on grounds that Benitez's "identification was the product of impermissibly suggestive identification procedures[.]"After a two-day hearing, the district court denied Defendant's motion applying the standards set forth in *Manson*, 432 U.S. 98, and *United States v. Sanchez*, 24 F.3d 1259 (10th Cir. 1994).

**{15}**	On October 14, 2016, the State filed a motion to admit evidence, pursuant to Rule 11-404(B), that on September 4, 2014, following their argument with the cashier at an Allsup's store, Defendant and a friend fired shots at the store, and the bullet casings from that Allsup's shooting matched the bullet casings found at the scene of the shooting of Cisneros and AO. After a hearing, the district court granted the State's motion.

## D.	The Trial, Sentence, and Appeal

**{16}**  At trial, the evidence showed that on October 24, 2014, Cisneros and AO got into Cisneros's car, drove together to the Rancho Zia Mobile Home Park——the neighborhood in which Defendant lived——and arrived at approximately 12:56 p.m. They parked in front of Defendant's house and waited there for approximately a half hour. Multiple phone calls were made and text messages sent between Defendant's and Cisneros's cell phones during this time. At about 1:30 p.m., Defendant and Melicendro got into Cisneros's car, and the group left the mobile home park. Cisneros dropped off Melicendro at the house of his friend Anthony Baca, and Defendant remained in the car. Baca's house is approximately an eight-minute drive in normal traffic from Defendant's home. From Baca's house to the crime scene is approximately another five-minute drive.

**{17}**  Agent Russell Romero, a member of the FBI Cellular Analysis Survey Team, testified as an expert in historical cell site analysis for "geo-locat[ing]" cell phone usage. Agent Romero testified that according to his analysis of Defendant's cell phone records, at 1:54 p.m. on the day of the shooting of Cisneros and AO, Defendant's cell phone was in the area of the scene of the shooting. Agent Romero stated that between 1:56 p.m. and 2:18 p.m., the location of Defendant's cell phone moved from the area of the scene of the shooting to an area near Baca's house. Defendant's cell phone remained in that area from approximately 2:18 p.m. to 2:42 p.m. Then at approximately 2:51 p.m., Defendant's phone location was consistent with being back in the area near his home until 2:55 p.m., after which the phone moved to a location in the area of the house of Defendant's friend Shantel by 3:05 p.m. According to Agent Romero's testimony, the phone calls and location data transmitted by Defendant's cell phone were not consistent with Defendant being at Shantel's residence prior to 3:05 p.m.

**{18}**  Evidence presented at trial included Defendant's DNA that was found on the exterior rear passenger-side door of Cisneros's car. An unknown male's DNA was also found on the exterior rear passenger-side door, and a different unknown male's DNA was found on the interior rear passenger-side door. Defendant has a tattoo on the right side of his face. Melicendro has a tattoo on the left side of his face. Melicendro and Baca invoked the Fifth Amendment when called to testify at trial. Benitez identified Defendant in court as the individual he saw walking away from the scene of the shooting on October 24, 2014.

**{19}**  The State called Joseph Montoya to testify. Montoya was an inmate at the Santa Fe County jail with Defendant between May 1 and May 18, 2015. Montoya testified that he and Defendant were acquaintances during their time incarcerated together and that on one occasion he had a conversation with Defendant during which he asked Defendant "[w]hy he had killed those two kids." Montoya stated that Defendant told him that he shot them because Cisneros owed him money for cocaine and that Defendant's uncle picked him up after the shooting. Montoya also testified that he had originally heard about the shooting on the news when he was in prison in Santa Rosa.

**{20}**  Prior to trial, Montoya entered into a plea agreement with the State to cooperate and testify in Defendant's case. In exchange for his testimony, Montoya agreed to serve one year of incarceration followed by three years of supervised probation. Prior to

entering into the agreement, Montoya faced 42.5 years of incarceration. Defendant called Denise Montoya, Montoya's ex-girlfriend, to testify. She stated that Montoya is a compulsive liar.

**{21}** Defendant pursued a theory at trial that individuals other than Defendant were motivated to kill Cisneros. In support of this theory, Defendant sought to elicit testimony from Cisneros's sister, Mirna Cisneros, that two weeks prior to his death, Cisneros told her, "I stole money from that mechanic that you used to go to" and also showed her cash and drugs, including marijuana and cocaine. The district court ruled the evidence was inadmissible under Rule 11-804(B)(3)(b) NMRA for lack of corroborating evidence. However, the district court also ruled that Mirna was permitted to testify "as to what she observed" when Cisneros made the statement to her and that Defendant could "argue that based on the existence of those drugs, and her observation of them, and the cash that was available" that "Cisneros was involved in some way in the drug trade, and that there were other individuals that may be wanting to harm him."

**{22}** Consistent with the district court's ruling, Mirna took the stand and testified that in the weeks prior to his death, Cisneros showed her cocaine, marijuana, and cash. In closing arguments to the jury, Defendant maintained that evidence was presented showing that individuals other than Defendant had the motive to kill Cisneros. At the close of evidence and arising from Montoya's testimony, Defendant proffered a jury instruction on informant testimony based on the Tenth Circuit Criminal Pattern Jury Instruction 1.14, which the district court refused. The jury was given an instruction addressing witness credibility modeled after UJI 14-5020 NMRA, which stated,

> You alone are the judges of the credibility of the witnesses and the weight to be given to the testimony of each of them. In determining the credit to be given any witness, you should take into account the witness's truthfulness or untruthfulness, ability and opportunity to observe, memory, manner while testifying, any interest, bias or prejudice the witness may have and the reasonableness of the witness's testimony, considered in the light of all of the evidence in the case.

**{23}** The jury returned verdicts convicting Defendant of two counts of first-degree murder. He was sentenced to two consecutive life terms. Defendant appeals directly to this Court. N.M. Const. art. VI, § 2. ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); Rule 12-102(A)(1) NMRA.

## II.    DISCUSSION

### A.    Admissibility of the Eyewitness Identification Evidence

**{24}** Defendant argues that under existing New Mexico law, which applies the standard under the United States Constitution as stated in *Manson*, the district court erred in denying his motion to suppress Benitez's out-of-court and in-court identification of him as the individual Benitez saw walking away from the scene of the shooting.

Alternatively, Defendant urges this Court to construe the due process provision of the New Mexico Constitution more broadly than its federal counterpart, part ways with the *Manson* doctrine, and "re-evaluate the admission of eyewitness identification evidence in[ ] our courts." Although we determine as unavailing Defendant's contention that suppression is warranted under existing case law, we do agree, as we will explain more fully, that the *Manson* reliability test violates due process under the New Mexico Constitution and should no longer be followed in New Mexico.

## 1.    Standard of review

**{25}**    An order denying suppression of eyewitness identification evidence is reviewed as a mixed question of fact and law, with the Court viewing the facts "in the manner most favorable to the prevailing party, and drawing all reasonable inferences in support of the court's decision." *State v. Salgado*, 1999-NMSC-008, ¶ 16, 126 N.M. 691, 974 P.2d 661 (brackets omitted) (internal quotation marks and citation omitted). We review the application of the law to those facts de novo. *See State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57. We also conduct de novo review of constitutional questions bearing on suppression. *See State v. Belanger*, 2009-NMSC-025, ¶ 8, 146 N.M. 357, 210 P.3d 783 ("This appeal implicates . . . the Fourteenth Amendment right to due process of law, including the right to a fair trial, and therefore our review is de novo.").

## 2.    The *Manson* rule and current New Mexico law

**{26}**    New Mexico has adopted the federal standard under *Manson* for determining whether the administration of an eyewitness photographic identification violates a defendant's right to due process. *See Baca*, 1983-NMSC-049, ¶ 18 (applying the rationale set forth in *Manson*, 432 U.S. 98, and in *Neil v. Biggers*, 409 U.S. 188 (1972)). "In reviewing the admissibility of an out-of-court photographic identification, we determine whether the procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and whether, under the totality of the circumstances, the identification was still reliable." *State v. Jacobs*, 2000-NMSC-026, ¶ 30, 129 N.M. 448, 10 P.3d 127; *Salgado*, 1999-NMSC-008, ¶ 16. In other words, even if the procedures are determined to be impermissibly suggestive, the identification may still be admitted if its reliability sufficiently outweighs the "corrupting effect" of the suggestive procedures. *Manson*, 432 U.S. at 114.[1] In considering whether the identification is reliable under the totality of circumstances, the relevant factors "include" (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness's degree of attention at the time of the crime," (3) "the accuracy of the witness's earlier descriptions of the criminal," (4) "the certainty of the witness about the identification," and (5) "the time elapsed between the crime and the identification

---

[1]"[United States Supreme Court] precedents refer to 'impermissibly,' 'unnecessarily,' and 'unduly' suggestive circumstances interchangeably," with each term "reinforc[ing the Court's] focus not on the act of suggestion, but on whether the suggestiveness rises to such a level that it undermines reliability." *Perry v. New Hampshire*, 565 U.S. 228, 254 n.3. (2012) (Sotomayor, J., dissenting) (citations omitted) (citing cases). The Supreme Court has not yet defined the term "suggestive" with specificity. *See, e.g., id.*

confrontation." *Jacobs*, 2000-NMSC-026, ¶ 30. In practical terms, the *Manson* rule sets a high bar for exclusion of identification evidence, requiring a court to find the evidence to be "*both* produced through an unnecessarily suggestive procedure *and* unreliable." *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994) (emphasis in original).

**{27}** Under this standard, Defendant argues that Benitez's out-of-court identification of him as the individual Benitez saw walking away from the scene of the shooting of Cisneros and AO was the product of impermissibly suggestive photographic identification procedures and that Benitez's identification lacked reliability.

### 3. No violation of the *Manson* rule

**{28}** The *Manson* test requires a court to determine "whether the procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and whether, under the totality of the circumstances, the identification was still reliable." *Jacobs*, 2000-NMSC-026, ¶ 30. The most significant factors to be considered in evaluating the suggestiveness of a photographic display are "[t]he size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *Salgado*, 1999-NMSC-008, ¶ 17 (internal quotation marks and citation omitted) (quoting *Sanchez*, 24 F.3d at 1262.

**{29}** Concerning the size of the array, this Court has joined many federal courts in holding that a photo array containing as few as six photographs—the size of the photo array used at the sheriff's office to identify Defendant herein—is not unconstitutional per se. *Id.*; *see, e.g.*, *United States v. Carter*, 410 F.3d 942, 948 (7th Cir. 2005) ("Six is a sufficient number of photos for such a line-up."); *United States v. Rosa*, 11 F.3d 315, 330 (2d Cir. 1993) (holding an "array of six not so small as to be impermissibly suggestive"); *see also Sanchez*, 24 F.3d at 1262 (upholding the use of a photo array containing six photographs although expressing the view that "the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the *weight* given to other alleged problems or irregularities in an array").

**{30}** Nor was it shown that the manner in which Detective Jaramillo presented the photo array to Benitez ran afoul of federal due process requirements. Notably, Defendant in his briefing to this Court does not directly argue that the detective exerted undue pressure on Benitez to make an identification from the array, much less that the officer's statements or actions during the identification procedure influenced which photograph Benitez ultimately chose.

**{31}** Instead, Defendant refers to the disputed testimony about Detective Jaramillo's alleged use of a prior photo display being presented to Benitez when they met at the crime scene two days before the photo display that took place at the sheriff's office. Defendant did not, however, adequately preserve or develop this argument at the suppression hearing, failing to invoke a ruling on or otherwise pursue the issue, in response to the eyewitness's disputed hearing testimony. *See State v. Silva*, 2008-NMSC-051, ¶ 9, 144 N.M. 815, 192 P.3d 1192 ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . ."

(omission in original) (internal quotation marks omitted) (quoting Rule 12-216(A) NMRA, recompiled as Rule 12-321(A) NMRA (effective Dec. 31, 2016)); *see also State v. DeAngelo M.*, 2015-NMSC-033, ¶ 18, 360 P.3d 1151 (noting that "an informed decision" on appeal was precluded by the absence of a record from the trial court). Given the incomplete state of the record as to the nature of any crime scene photo display that may have occurred, an informed determination on the constitutional propriety of the detective's conduct in this regard is not possible.

**{32}** Finally, the district court found that the photo array shown to Benitez depicted men of equivalent age and ethnicity who shared similar physical characteristics, including the presence of prominent tattoos on their necks and/or faces. Although Defendant's expert witness on eyewitness identification, Dr. Roy Malpass, offered testimony at the suppression hearing seeking to highlight the facial features distinguishing the persons depicted in the photo array, none were so remarkable or unique as to make one photograph stand out over any other photograph in the group. *See Jarrett v. Headley*, 802 F.2d 34, 41 (2nd Cir. 1986) ("It is not required . . . that all of the photographs in the array be uniform with respect to a given characteristic."); *see also United States v. Holliday*, 457 F.3d 121, 126 n.5 (1st Cir. 2006) (observing that although the police "are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification[, they] are not required to search for identical twins . . .") (internal quotation marks and citation omitted); *United States v. Nash*, 946 F.2d 679, 681 (9th Cir. 1991) (holding a photo array not impermissibly suggestive despite differences in hairstyles, ethnicity, and complexions); *but cf. United States v. Wiseman*, 172 F.3d 1196, 1209-10 (10th Cir. 1999) (determining that a photo array "was unduly suggestive" where the defendant's photo stood out from the others in showing him "with very prominent dark circles under his eyes and with an extremely unnatural, chalk-white pallor, while the skin tones in the photos of the [fillers] look quite natural"), *abrogated on other grounds by Rosemond v. United States*, 572 U.S. 65, 70 (2014).

**{33}** Because neither the composition nor the administration of the sheriff's office photo display was shown to be unduly suggestive under federal constitutional rules, the reliability of that identification under *Manson* and its progeny is not considered. *See Jarrett*, 802 F.2d at 42 (holding that where pretrial identification procedures "were not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility"). It also follows that Benitez's subsequent in-court identification of Defendant at trial was properly admitted under federal due process standards. *See Salgado*, 1999-NMSC-008, ¶ 23 (upholding trial court's decision to allow in-court identification upon determining that a photographic array was not impermissibly suggestive).

### 4.    Defendant's argument under the New Mexico Constitution

**{34}** Having rejected Defendant's federal due process claim concerning Benitez's pretrial and in-court identifications, we turn to his argument that Article II, Section 18 of the New Mexico Constitution provides broader due process protection in this context. The reliability of an eyewitness identification at trial is a due process requirement.

*Patterson*, 2001-NMSC-013, ¶ 20. This Court has not yet held that Article II, Section 18 generally provides greater due process protection than its federal counterpart. *Cf. Morris v. Brandenburg*, 2016-NMSC-027, ¶¶ 32-38, 376 P.3d 836 (performing an interstitial analysis and concluding "that there are no distinctive state characteristics with respect to the due process protections of Article II, Section 18 that warrant a departure from the federal analysis"); *see also* U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law."); N.M. Const. art. II, § 18 ("No person shall be deprived of life, liberty or property without due process of law.")

**{35}** When the New Mexico constitutional provision has not yet been determined to provide greater protection under the interstitial analysis, trial counsel must (1) fairly invoke a ruling; (2) "develop the necessary factual base and raise the applicable constitutional provision in trial court;" and additionally, (3) "argue that the state constitutional provision should provide greater protection, and suggest reasons as to why, for example, a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *State v. Leyva*, 2011-NMSC-009, ¶ 49, 149 N.M. 435, 250 P.3d 861(emphasis omitted)(internal quotation marks and citation omitted); *accord State v. Ketelson*, 2011-NMSC-023, ¶¶ 10-11, 150 N.M. 137, 257 P.3d 957.

**{36}** Defendant clearly invoked a ruling by the district court that Article II, Section 18 of the New Mexico Constitution should be construed to afford broader due process protections in the context of admissibility of eyewitness identification evidence because the current standard is premised on a flawed federal analysis that fails to account for scientific developments in the fields of memory and eyewitness identification that have taken place since the federal analysis was adopted. We therefore review Defendant's argument that Article II, Section 18 provides broader due process protections in the context of eyewitness identifications because the federal analysis is flawed.

**{37}** Defendant argues that the "reliability" test announced in *Manson* and now controlling in New Mexico is flawed and should be abandoned because "it is outdated and does not account for the major scientific findings on eyewitness identification" since *Manson* was decided more than four decades ago. Defendant asserts that this Court should either "adopt a *per se*" rule to exclude eyewitness identification evidence when impermissibly suggestive identification procedures have been used or alternatively update the current reliability standard to better reflect the science on eyewitness identification evidence.

**{38}** In order to assess the merits of Defendant's state constitutional claim, we examine the substantial body of empirical scientific studies on human memory and perception undertaken in the wake of *Manson* and the legal literature, decisional law, and statutory enactments that have developed accordingly.

a. **The scientific research**

**{39}** The reliability and significance of post-*Manson* scientific studies addressing the psychological factors affecting eyewitness identifications are now widely acknowledged by the courts. *E.g.*, *United States v. Downing*, 753 F.2d 1224, 1242 & n. 23 (3d Cir. 1985) (noting "the proliferation of empirical research demonstrating the pitfalls of eyewitness identification" and concluding that "the consistency of the results of these studies is impressive" (internal quotation marks and citation omitted); *accord People v. McDonald*, 690 P.2d 709, 718 (Cal. 1984) (en banc) (cautioning courts not to "remain oblivious" to the implications of the eyewitness identification studies "for the administration of justice"), *overruled on other grounds by People v. Mendoza*, 4 P.3d 265, 278 (Cal. 2000); *see also Young v. Conway*, 715 F.3d 79, 81 (2d Cir. 2013) (denying rehearing en banc) (Parker, J., concurring) (underscoring the importance of ensuring that trial judges are made aware of the existence of the "robust and growing body of high-quality scientific studies addressing problems surrounding eyewitness identifications").

**{40}** Scientific research calls into serious question the continued efficacy of the legal framework established in *Manson* and currently applied in New Mexico. *See, e.g.*, Brandon L. Garrett, *Eyewitnesses and Exclusion*, 65 Vand. L. Rev. 451, 468-69 (2012) ("Eyewitness identifications are designed to be a test of a witness's memory."). However, since the *Manson* decision, "[a] now vast body of social science research has demonstrated that most of the five *Manson* 'reliability' factors do not correlate at all with the reliability of an eyewitness's identification." *Garrett*, *supra*, at 468-69. In addition, due to the powerful effect eyewitness identification has on juries, especially when stated in a confident manner, modern scholars now recognize that mistaken identification evidence is the most significant cause of wrongful convictions in the United States. *See Perry*, 565 U.S. at 263-65 (Sotomayor, J., dissenting); *see also* Jules Epstein, *The Great Engine That Couldn't: Science, Mistaken Identifications, & the Limits of Cross-Examination*, 36 Stetson L. Rev. 727, 729-30 (2007) ("As the [DNA] exonerations grew in number, the role of mistaken-identification testimony retained its prominence."); Sandra G. Thompson, *Judicial Blindness to Eyewitness Misidentification*, 93 Marq. L. Rev. 639, 639 (2009) (same); Gary L. Wells & Eric P. Seelau, *Eyewitness Identification: Psychological Research & Legal Policy on Lineups*, 1 Psychol., Pub. Pol'y, & L. 765, 787 (1995) (same).

**{41}** The scientific literature demonstrates multiple reasons why eyewitness testimony can be erroneous despite the fact that a witness testifies "in good faith and with a high degree of confidence," as we now summarize. Robert A. Wise, Clifford S. Fishman & Martin A. Safer, *How to Analyze the Accuracy of Eyewitness Testimony in a Criminal Case*, 42 Conn. L. Rev. 435, 454-55 (2009). Human "[m]emory is [m]alleable." Thomas D. Albright, *Why Eyewitnesses Fail*, 114.30 Proceedings of the National Academy of Sciences 7758, 7760 (2017), *available at* https://www.pnas.org/content/pnas/114/30/7758.full.pdf (last visited Aug. 28, 2020).

> [A]n eyewitness's memory of a crime is not stored like a videotape that the eyewitness can replay to produce an exact record of the crime. It frequently does not contain the degree of detail sought by criminal investigators. Instead, when an eyewitness recalls a crime, he or she

unconsciously reconstructs his or her memory of the crime. In unconsciously reconstructing his or her memory of the crime, the eyewitness unknowingly fills in the gaps in his or her factual memory of the crime based on such factors as the eyewitness's expectations, attitude, beliefs, and knowledge of similar events. These different sources of information are automatically blended together in the eyewitness's memory to produce an account of the crime that is apparently seamless and coherent but that may contain inaccuracies.

Wise et al., *supra*, at 455-56 (footnotes omitted).

**{42}** In addition, eyewitnesses are biased. *Id.* at 456. An eyewitness's biases influence not only what the eyewitness "recalls about a crime, but also what the eyewitness perceives" and encodes into memory about the crime. *Id.* (stating that "[e]ncoding refers to the process by which an eyewitness transforms what he or she perceives about a crime into a stored memory"). "For example, if a hair stylist witnesses a crime, he or she may pay more attention to the perpetrator's hair than other eyewitnesses would." *Id.* And "[b]ecause encoding involves interpretation and inference, what is stored in memory is not just what the eyewitness saw during the crime, but also the meaning the eyewitness gave to what occurred," which is further influenced by factors like stress level, presence of a weapon, new faces, pictures, and events experienced after the crime. *Id.*

**{43}** Eyewitness testimony may also be erroneous due to the "[m]isinformation [e]ffect." *Id.* at 457. "Because an eyewitness's memory of a crime is a reconstructive process, it can be altered by information that the eyewitness learns after the crime from other sources such as other eyewitnesses, the police, the prosecutor, and the media." *Id.* This kind of "post-event information not only affects an eyewitness's memory of the crime, but it may also impair his or her ability to identify the perpetrator of the crime." *Id.*

**{44}** A fourth reason for misidentification stems from "[s]ource [m]onitoring [e]rrors." *Id.* This category of cognitive error occurs when eyewitnesses become "confused about where they learned information about a crime or where they saw an individual." *Id.* These errors lead to misattribution of information that eyewitnesses believe they saw during the crime to other sources they encountered later. *Id.* There is, in addition, "[h]indsight [b]ias," which refers to the cognitive error that occurs when an individual knows how an event turns out and this knowledge influences the individual's memory of what the individual believes about what actually occurred. *Id.* at 458. It follows that when "an eyewitness learns that a suspect has been indicted and is going to be tried for a crime, this information alters an eyewitness's memory of the crime and what the eyewitness remembers . . . or . . . was thinking when the crime occurred." *Id.*

**{45}** "Eyewitness [o]verconfidence" and tendencies toward "[r]elative [j]udgment" in making identifications also contribute to erroneous misidentifications. *Id.* at 458-60. In general, "[p]eople tend to overestimate the accuracy of their perceptions and memory[,]" and as such, "eyewitnesses are likely to be overconfident about the accuracy of their account of the crime and their identification of the suspect as the perpetrator of the

crime." *Id.* at 458. Like memory, confidence in a memory is malleable, and postevent information can increase an eyewitness's confidence in a false memory. *Id.* at 458-59. Similarly, in the context of a lineup or photo array, eyewitnesses are likely to make a relative judgment in identifying a perpetrator such that eyewitnesses will choose the person "who most closely resembles their memory of the perpetrator of the crime." *Id.* at 460. Relative judgments stem from two assumptions frequently made by eyewitnesses: (1) "law enforcement would not conduct a lineup if they did not have a suspect," and (2) "eyewitnesses feel pressure from law enforcement, relatives, friends, and themselves to make an identification." *Id.* at 460-61.

**{46}**    Often lineups are done in such a way that the eyewitness's attention is drawn to the suspect. *Id.* at 461. Drawing an analogy from lineups to scientific experiments generally, Wise observes that "[s]cientists have long known that safeguards are necessary to ensure that they do not unintentionally influence participants in an experiment" and so have implemented protections to ensure data collected is not the product of the experimenter's biases or other extraneous factors. *Id.* Just as accurate scientific data depends on application of a scientific method free of bias and other extraneous factors, Wise continues, extracting reliable eyewitness identification evidence "depends in part on the use of proper scientific procedures." *Id.* at 463. And where studies show that "most lineups do not comply with scientific guidelines for conducting fair and unbiased" identifications, such procedures taint eyewitness identification evidence that is frequently admitted at trial. *Id.*

**{47}**    Apart from the foregoing summary, a brief overview of the existing science[2] reveals a near consensus among experts that certain factors may inherently impair the ability of witnesses to accurately process what they observe. These factors, described as "variables," fall into two categories: (1) system variables—those surrounding the identification procedure itself—which largely lie within the exclusive control of law enforcement officers, and (2) estimator variables—those peculiar to the circumstances of the crime and a witness's observation of it—over which the criminal justice system lacks control. *See* Gary L. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Variables*, 36 Journal of Personality & Social Psychology 1546, 1546-57 (1978) (coining the terms "system" and "estimator" variables), *available at* https://www.researchgate.net/publication/279926900_Applied_eyewitness-testimony_research_System_variables_and_estimator_variables (last visited Aug. 28, 2020). System variables bear on the suggestiveness of an identification procedure while estimator variables are used to evaluate an identification's reliability. *See State v. Henderson*, 27 A.3d 872, 920-23 (N.J. 2011).

**{48}**    With respect to system variables, psychological studies provide valuable insights for developing best practices for the fair, proper, and nonsuggestive administration of identification procedures. The relevant science shows, for instance, that it is preferable for a lineup identification, whether photographic or corporeal, to be conducted by a

---

[2]More comprehensive discussions of the scientific research relating to memory and eyewitness identification are provided in *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 320-32 (3rd Cir. 2016) (en banc) (McKee, C.J., concurring), and in *State v. Lawson*, 291 P.3d 673, app. at 700-11 (Or. 2012).

"blind" administrator— referring to one who does not know the identity of the suspect or where the suspect is located during the procedure—so as to avoid influence over the witness regarding which person to select. *See* Bill Nettles, Zoe Sanders, & Gary L. Wells, *Eyewitness identification: 'I noticed you paused on number three.'*, *The Champion* 11, 11-12 (Nov. 1996) (explaining the "Experimenter Expectancy Effect" by which a nonblind lineup administrator unintentionally "can make the subject respond with the desired outcome"), *available at* https://lib.dr.iastate.edu/cgi/viewcontent.cgi?article=1081&context=psychology_pubs (last visited Aug. 28, 2020). Such subtle forms of feedback imparted by nonblind lineup administrators by way of tone of voice, demeanor, facial expressions, and the like are difficult to detect and prevent and, indeed, are often unknown and unknowable to both witnesses and administrators alike. *See* Ryann M. Haw & Ronald P. Fisher, *Effects of Administrator-Witness Contact on Eyewitness Identification Accuracy*, 89 Journal of Applied Psychology 1106, 1110 (2004) (summarizing results of numerous experimental studies), *available for purchase at* https://psycnet.apa.org/doiLanding?doi=10.1037%2F0021-9010.89.6.1106 (last visited Aug. 28, 2020).

{49}     A separate but related system variable often discussed in the scientific literature involves the tendency of postidentification, confirmatory feedback by lineup administrators to falsely inflate both witnesses' confidence in the accuracy of their prior identifications and witnesses' assessments of their opportunity to view the perpetrator(s) and the crime. In distorting eyewitness recollections and increasing eyewitness confidence, post-identification suggestive feedback serves to create inherently unreliable witnesses who, by projecting undue confidence in their identifications, are well positioned to offer testimony that serves as a double-edged sword, at once appealing to jurors' well-documented proclivity to "place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy" while also proving to be "resistan[t] to the ordinary tests of the adversarial process." *Perry*, 565 U.S. at 249, 264 (Sotomayor, J., dissenting); *see also* Amy B. Douglass & Nancy Steblay, *Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect*, 20 Applied Cognitive Psychology 859, 861, 864-65 (2006) (examining the results of twenty experiments, involving over 2,400 participants, which "provide dramatic evidence that post-identification feedback can compromise the integrity of a witness's memory"), *available for purchase at* https://onlinelibrary.wiley.com/doi/10.1002/acp.1237 (last visited Aug. 28, 2020); Elizabeth F. Loftus et al., *Eyewitness Testimony: Civil and Criminal* § 3-8, at 69 (4th ed. 2007) ("[H]uman recollection can be supplemented, partly restructured, and even completely altered by postevent inputs.").

{50}     Scientific research also offers important insights into the workings of a wide array of estimator variables that are prone to diminish the reliability of an eyewitness identification. Prominently discussed in the scientific literature are variables relating to the focus of a witness's attention during the commission of a crime, a factor which is often dependent on a witness's level of stress or distraction at the time. All forms of the "[w]itness [a]ttention" variable are rooted in the same basic psychological principle: despite popular misconceptions to the contrary, a person's memory does not "operate[ ]

like a videotape, recording an exact copy of everything the person sees," with studies showing instead that "[a] person's capacity for processing information is finite, and the more attention paid to one aspect of an event decreases the amount of attention available for other aspects." *Lawson*, 291 P.3d at 701 (citing Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1, 10-11 (2009)). Put differently, science shows that "[r]emembering is not the re-excitation of innumerable fixed, lifeless and fragmentary traces. It is an imaginative reconstruction, or construction, built out of the relation of our attitude towards a whole active mass of organized past reactions or experience" where "the past is being continually re-made, reconstructed in the interests of the present." *People v. Shirley*, 723 P.2d 1354, 1378 (Cal. 1982) (en banc) (internal quotation marks omitted) (quoting Sir Frederick C. Bartlett, *Remembering* 213, 309 (1932, reprinted 1964) *superseded by statute on other grounds as stated in People v. Alexander*, 235 P.3d 873, 880(Cal. 2010)); *accord Henderson*, 27 A.3d at 894 (describing memory as "a constructive, dynamic, and selective process").

**{51}** A frequently discussed aspect of the "[w]itness [a]ttention" variable is what the scientific literature and case law describe as the "weapon-focus effect," the empirically tested theory that "the visible presence of a weapon during an encounter negatively affects memory for faces and identification accuracy because witnesses tend to focus their attention on the weapon instead of on the face or appearance of the perpetrator, or on other details of the encounter." *Lawson*, 291 P.3d at 701 (citing Kerri L. Pickel, *Remembering and Identifying Menacing Perpetrators: Exposure to Violence and the Weapon Focus Effect*, 2 *The Handbook of Eyewitness Psychology: Memory for People* 339 (R.C.L. Lindsay et al. eds., 2007)). Studies also show, as a corollary, that witness distraction resulting from the presence of any unusual or out-of-place object, whether dangerous or not, can similarly impair a witness's recall ability. *See Lawson*, *id.* (pointing to studies "document[ing] similar impairment of identification performance when witnesses viewed the target holding unusual, but nonthreatening, objects like a stalk of celery or a toy doll"). And because science supports the conclusion that "witnesses generally do not contemporaneously observe their own degree of attention or other viewing conditions as they observe an event," their subsequent self-reporting on how closely they were paying attention "is particularly susceptible to the inflating effects of confirming feedback." *Id.* at 702.

**{52}** Testimony given at the suppression hearing by Dr. Roy Malpass, whom Defendant called to testify as an expert in eyewitness identification and memory, is consistent with the scientific studies. Dr. Malpass testified that suggestive identification procedures can lead to changes in the memory of an eyewitness, ranging from entirely replacing the witness's memory to altering the witness's memory of particular features of the perpetrator. Dr. Malpass further explained that a suggestive out-of-court identification taints a subsequent in-court identification because the in-court identification stems from a contaminated memory.

**b.    The legal literature**

**{53}** The legal literature is replete with discussions of the doctrinal and scientific shortcomings of the *Manson* reliability test and the significant threat posed to the integrity of our criminal justice system by misidentifications engendered by the *Manson* rule. Concerning the threat posed to the integrity of our criminal justice system by misidentifications, a recent report from a court task force examining eyewitness identification evidence had this to say:

> Eyewitness misidentifications have been a factor in well over half of the cases that resulted in wrongful convictions later overturned by DNA evidence. Nearly seventy percent of the DNA driven exonerations in the United States involved eyewitness misidentifications. Eyewitness misidentification is the "single greatest source" of wrongful convictions in the United States. In fact, mistaken identifications "are responsible for more wrongful convictions than all other causes combined." Innocent people are convicted, the perpetrator goes free, and public confidence in the judicial system erodes.

*2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 Temp. L. Rev. 1, 10-11 (2019) (footnotes omitted).

**{54}** As to the analytic weaknesses of the *Manson* rule, commentators have expressed the view that the United States Supreme Court's two-part test—which relegates unnecessary suggestiveness to a threshold inquiry and focuses primarily on five fixed "reliability" factors—is untethered to any sound scientific knowledge. *See, e.g.*, *Principles of the Law, Policing*; *Eyewitness Identifications* § 10.01, at 75 reporters' notes (Am. Law Inst., Tentative Draft No. 2, March 18, 2019, approved June 18, 2020) (recognizing that the *Manson/Biggers* framework "does not comport with scientific research," which "has called into question the validity of many of the Supreme Court's so-called 'reliability' factors"), *available at* http://www.thealiadviser.org/policing/policing-principles/ (last visited Aug. 28, 2020); *see* Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 44 (Nat'l Acads. Press 2014) (concluding that the *Manson* test "evaluates the 'reliability' of eyewitness identifications using factors derived from prior rulings and not from empirically validated sources" and "includes factors that are not diagnostic of reliability"); *see also* Suzannah B. Gambell, *The Need to Revisit the Neil v. Biggers Factors: Suppressing Unreliable Eyewitness Identifications*, 6 Wyo. L. Rev. 189, 217-18 (2006) (describing the *Neil v. Biggers* reliability factors as "under-inclusive and outdated" in terms of "current scientific research"); Benjamin E. Rosenberg, *Rethinking the Right to Due Process in Connection with Pretrial Identification Procedures: An Analysis and a Proposal*, 79 Ky. L.J. 259, 281 (1990-91) ("[G]iven the emergent state of scientific knowledge about eyewitness identifications, the Supreme Court's adoption of the five factors test was not a sound application of scientific principles to constitutional adjudication."); Wise et al., *supra* at 448 (pointing to the fact that the *Neil v. Biggers* and *Manson* decisions "predated the vast majority of scientific research on eyewitness testimony" and describing the reliability factors set forth therein as the Supreme Court's "educated guesses" on how the specified factors "affect identification accuracy" (internal quotation marks and

citation omitted)). At a minimum, there appears to be broad consensus among commentators that three of the five *Manson* factors—view, attention, and certainty—are insufficiently independent from each other and from the suggestiveness of a given identification procedure to be accurate predictors of reliability and accuracy. *See, e.g.*, Nicholas A. Kahn-Fogel, *The Promises and Pitfalls of State Eyewitness Identification Reforms*, 104 Ky. L.J. 99, 115 (2015-16) (identifying the three "largely subjective, self-reporting factors" set forth in *Manson* as "opportunity to view, degree of attention, and confidence" and concluding that "the *Manson* analysis has tended to create a sort of perverse feedback loop, in which the *Manson* factors seem to reinforce the reliability of the most suggestive procedures"); Wells & Quinlivan, *supra*, at 9 (describing those same suspect *Manson* criteria as "retrospective self-reports" that are "highly malleable in response to even slight changes in context . . . , the social desirability of the responses, the need to appear consistent, and reinterpretations of the past based on new events").

{55}    These concerns have prompted commentators to call for the adoption of new, science-driven admissibility standards in place of the reliability-based formulation set out in *Manson*. *See, e.g.*, *Principles of the Law, Policing; Eyewitness Identifications*, *supra*, § 10.01 at 76 (pointing to the United States Supreme Court's "acquiescent approach to eyewitness identification, and the current state of research" in recognizing the need for "laws and policies that adhere to our best understanding of the reliability of eyewitness testimony and the factors that in fact heighten or diminish reliability in any given case"); Sandra Guerra Thompson, *Judicial Gatekeeping of Police-Generated Witness Testimony*, 102 J. Crim. L. & Criminology 329, 365, 368 (2012) (concluding that adherence to "anemic" federal due process standards such as those laid out in *Manson* have proved inadequate to ensure the reliability of "police-generated witness testimony" and calling for various judicial reforms, including requirements that law enforcement follow best practices in procuring eyewitness identifications).

{56}    Based on the research, legal scholars in the field of eyewitness identification evidence now also advocate for state courts to adopt a per se exclusionary rule for suggestively obtained eyewitness testimony. *See* Gambell, *supra*, at 214 ("A per se exclusion of unnecessarily suggestive identifications could alleviate many dangers posed to defendants from eyewitness identifications."); Rosenberg, *supra*, at 303, 314-15 (same); Wise et al., *supra*, at 450 (same).

### 5.    State court decisions modifying or departing from the *Manson* test

{57}    State courts have, in recent years, shown an enhanced willingness to answer the commentators' clarion calls to adopt alternative approaches in assessing the admissibility of identification evidence, approaches consistent with modern scientific knowledge of the mechanics and malleability of human memory.

{58}    Some jurisdictions, though adhering to *Manson*'s reliability-based framework, have taken modest measures to refine or expand upon *Manson*'s reliability criteria to be more closely aligned with modern empirical realities. *See State v. Copeland*, 226 S.W.3d 287, 290, 299-300 (Tenn. 2007) (relying on empirical studies addressing the

limitations and weaknesses of eyewitness testimony to overrule prior state precedent and by allowing the admission of expert testimony on the reliability of eyewitness identifications in appropriate cases); *State v. Discola*, 2018 VT 7, ¶¶ 30-31, 184 A.3d 1177 (joining Kansas and Utah in abandoning witness certainty as a factor in evaluating the reliability of eyewitness identifications and, in so doing, pointing to post-*Manson* scientific evidence "concerning the fallibility of eyewitness identification, and specifically the effect of suggestive circumstances on the degree of certainty the witness expresses in an identification").

**{59}**   Other jurisdictions have undertaken more sweeping reforms. *See Henderson*, 27 A.3d at 919-22 (overhauling the courtroom framework for the admission of eyewitness identification evidence in New Jersey by adopting new procedures for evaluating suggestiveness and reliability, procedures which account for system and estimator variables); *Lawson*, 291 P.3d at 684-85, 697 (revising Oregon's version of the *Manson* test under state evidence rules to include the use of system and estimator variables); *see generally Small v. State*, 211 A.3d 236, 261-63 & n.5 (Md. 2019) (Barbera, C.J., concurring) (surveying state court cases that "recogniz[e] the need to progress beyond the five-factor *Manson* test" and concluding that "[t]he current body of research makes a strong case" for courts "not simply to break free from reliance on the *Manson* test, but also to develop a more rigorous protocol for assessing eyewitness identification reliability").

**{60}**   The developing case law of Massachusetts and New York is particularly useful in informing our analysis. Each of these jurisdictions has rejected outright *Manson*'s traditional two-pronged test—which inquires whether a pretrial identification is reliable in spite of the suggestive procedures under which it was made—in favor of a bright-line, per se exclusionary rule triggered on the basis of suggestiveness alone.

**{61}**   Massachusetts courts have long recognized both the "undeniable" reality that "a defendant has a due process right to identification procedures meeting a certain basic standard of fairness[,]" *Commonwealth v. Dougan*, 386 N.E.2d 1, 8-9 (Mass. 1979) (stating that "eyewitness identification often plays a major, if not a determinative, role in the trial of criminal offenses, and the dangers of mistaken identification are great and the result possibly tragic" (internal quotation marks and citation omitted)), and the shortcomings of the *Manson* reliability test that provides "little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications and, ultimately, from wrongful convictions," *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1262 (Mass. 1995). Consistent with these views, the Supreme Judicial Court of Massachusetts has held, as a matter of state constitutional law, that an out-of-court eyewitness identification made during a police identification procedure is not admissible "where the defendant proves by a preponderance of the evidence, considering the totality of the circumstances, that the identification is so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process." *Commonwealth v. Walker*, 953 N.E.2d 195, 205 (Mass. 2011), *disagreed with on other grounds by Commonwealth v. Lally*, 46 N.E.3d 41, 52 & n.10 (Mass. 2016). Under this per se formulation, "a defendant must prove not only that the out-of-court identification procedure administered by the police was suggestive, but

that it was *unnecessarily* suggestive," an inquiry which focuses on whether police have "good reason" to engage in a suggestive identification procedure in the first instance. *See Commonwealth v. Johnson*, 45 N.E.3d 83, 88 (Mass. 2016) (internal quotation marks and citations omitted); *see also Commonwealth v. Austin*, 657 N.E.2d 458, 461 (Mass. 1995) (recognizing that the "good reason" inquiry is case specific, turning on such factors as "the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track").

{62}   A significant feature of this Massachusetts jurisprudence is the Supreme Judicial Court's establishment of a protocol for the police to follow in conducting a photographic identification procedure, *see Commonwealth v. Silva-Santiago*, 906 N.E.2d 299, 312 (Mass. 2009), *abrogated on other grounds by Commonwealth v. Moore*, 109 N.E.3d 484, 497 & n.9 (Mass. 2018). The protocol was adopted as part of the court's "superintendence . . . authority to regulate the presentation of evidence in court proceedings" and reflects the court's "recognition that there is a near consensus in the relevant scientific community that the failure to follow such a protocol increases the risk of misidentification." *Commonwealth v. Thomas*, 68 N.E.3d 1161, 1168-69 (Mass. 2017).[3]

{63}   New York, for its part, has also adopted a per se exclusionary rule in lieu of the traditional *Manson* standard, based on concerns over the inherent frailties of eyewitness identification evidence that mirror the concerns expressed by Massachusetts courts. *See People v. Santiago*, 958 N.E.2d 874, 880 (N.Y. 2011) (recognizing that "mistaken eyewitness identifications play a significant role in many wrongful convictions"); *People v. Riley*, 517 N.E.2d 520, 524 (N.Y. 1987) (describing as "self-evident" the weaknesses and dangers of improper, albeit "potent," identification evidence, and cautioning that "[t]he complex psychological interplay and dependency of erroneously induced

---

3The Massachusetts photo identification protocol, modeled after Department of Justice guidelines, *see* U.S. Dep't of Justice, *Eyewitness Evidence: A Guide for Law Enforcement*, 19, 31-34 (1999), *available at* https://www.ncjrs.gov/pdffiles1/nij/178240.pdf (last visited Aug. 28, 2020), calls for law enforcement agents to clearly explain certain information before providing a photo array to an eyewitness. Instructions to the eyewitness include that

> he will be asked to view a set of photographs; the alleged wrongdoer may or may not be in the photographs depicted in the array; it is just as important to clear a person from suspicion as to identify a person as the wrongdoer; individuals depicted in the photographs may not appear exactly as they did on the date of the incident because features such as weight and head and facial hair are subject to change; regardless of whether an identification is made, the investigation will continue; and the procedure requires the administrator to ask the witness to state, in his or her own words, how certain he or she is of any identification.

*Silva-Santiago*, 906 N.E.2d at 312. While *Silva-Santiago* did not directly address the issue, the Massachusetts high court has since clarified that, although an identification procedure conducted without strict adherence to the court-promulgated protocol is per se unnecessarily suggestive, the failure of law enforcement to follow each aspect of the protocol is not necessarily so "conducive to irreparable mistaken identification as to deny the defendant due process of law" or, standing alone, to warrant suppression of an otherwise properly conducted and fair identification. *See Thomas*, 68 N.E.3d at 1169-70 (internal quotation marks and citation omitted).

identification evidence . . . must be vigilantly guarded against because this kind of error drives right into the heart of the adjudicative guilt or innocence process affecting the person accused and identified"); *People v. Caserta*, 224 N.E.2d 82, 83 (N.Y. 1966) ("One of the most stubborn problems in the administration of the criminal law is to establish identity by the testimony of witnesses to whom an accused was previously unknown, from quick observation under stress or when . . . there was no particular reason to note the person's identity."). In *People v. Adams*, 423 N.E.2d 379, 383-84 (N.Y. 1981), the Court of Appeals, New York's court of last resort, refused to adopt the *Manson* reliability test, finding it incompatible with the due process protections afforded by its state constitution. In concluding that evidence of the identification procedure there at issue—a police "station house" showup—was improperly admitted at trial, the *Adams* court relied solely on the inherent suggestiveness of the procedure, stating as follows:

> A reliable determination of guilt or innocence is the essence of a criminal trial. A defendant's right to due process would be only theoretical if it did not encompass the need to establish rules to accomplish that end. Permitting the prosecutor to introduce evidence of a suggestive pretrial identification can only increase the risks of convicting the innocent in cases where it has the desired effect of contributing to a conviction.

*Id.* Recognizing that "[t]he unfairness to the defendant and the unreliability of [suggestive, pretrial identification procedures] adversely impact the truth-finding process," *People v. Marshall*, 45 NE.3d 954, 960 (N.Y. 2015), New York's highest court has applied a per se rule of exclusion to different police-orchestrated, pretrial identification procedures, including some photographic identification procedures. *Id.* ("[A] pretrial identification procedure that is unduly suggestive violates a defendant's due process rights and is not admissible to determine the guilt or innocence of an accused." (internal quotation marks and citations omitted)).

**{64}** Both Massachusetts and New York apply harmless error review to due process challenges involving the erroneous admission of such evidence. *See Commonwealth v. Jones*, 666 N.E.2d 994, 995, 999 (Mass. 1996); *People v. Johnson*, 599 N.E.2d 682, 683 (N.Y. 1992); *Adams*, 423 N.E.2d at 384.[4] Their application of harmless error principles accords with the broad consensus of courts, federal and state, that have addressed the issue. *See, e.g. Biggers v. Tennessee*, 390 U.S. 404, 408-09 (1968) (recognizing that the admission of unreliable identification evidence obtained from an unduly suggestive lineup violates a defendant's due process rights and thus is subject to review under the constitutional harmless error standard); *see also Manson*, 432 U.S. at 118 n.* (Stevens, J., concurring) (noting that facts that "tend[] to confirm [the defendant's] guilt" but do not support reliability under *Manson* should be considered only to determine "whether error, if any, in admitting identification testimony was harmless"); *United States v. Concepcion*, 983 F.2d 369, 379 (2d Cir.1992) (concluding that admission of evidence obtained in "unduly suggestive" pretrial identification procedures

---

4In this sense, the use of the term "per se" connotes not that reversal is automatic upon a showing of an unnecessarily suggestive identification procedure but that rejection of the tainted identification evidence itself is required per se.

"was harmless beyond a reasonable doubt"); *State v. Artis*, 101 A.3d 915, 928 (Conn. 2014) (concluding that use of an unreliable eyewitness identification resulting from unnecessarily suggestive procedures is subject to harmless error review like "any other improperly admitted evidence" and pointing to the absence of any countervailing authority in the holdings of "federal and sister state courts" nationwide).

**{65}** The rationale often given for the use of harmless error analysis in these circumstances is that the improper admission of eyewitness identification testimony, like other evidentiary matters, involves not a "structural defect affecting the framework within which the trial proceeds" but instead a "'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 307-08, 310 (1991); *see* 7 Wayne R. LaFave et al., *Criminal Procedure* § 27.6(d), at 153-54 (4th ed. 2015) (discussing the relevance of *Fulminante* to harmless error analysis).

### 6. The New Mexico Accurate Eyewitness Identification Act

**{66}** State courts are not alone in their responses to the scientific research. A number of state legislatures have also taken measures to ensure that current scientific standards are taken into account in regulating the manner in which identification procedures are administered. *See Principles of the Law, Policing; Eyewitness Identifications*, *supra*, § 10.02 at 82 (collecting statutes); *see also Manson*, 432 U.S. at 117-18 (Stevens, J., concurring) (encouraging "experimentation" on the part of state legislatures in developing "new rules to minimize the danger of convicting the innocent on the basis of unreliable eyewitness testimony").

**{67}** Our Legislature has recently joined those ranks in taking remedial action, by enacting the Accurate Eyewitness Identification Act (the Act), as part of a comprehensive criminal justice reform bill which became effective July 1, 2019. *See* 2019 N.M. Laws, ch. 211, §§ 12-15 (compiled as NMSA 1978, §§ 29-3B-1 to -4 (2019)). The Act requires all law enforcement agencies conducting eyewitness identification procedures to adopt, no later than, January 1, 2020, and biennially review written policies for the administration of the identification procedures. *See* § 29-3B-3(A), (C). The law enforcement agency "shall adopt those practices shown by reliable evidence to enhance the accuracy of identification procedures." Section 29-3B-3(D). The biennial review is conducted "to incorporate new scientifically supported protocols." Section 29-3B-3(C). In developing and revising those policies, law enforcement agencies must include "practices shown by reliable evidence to enhance . . . the objectivity and reliability of eyewitness identifications and to minimize the possibility of mistaken identifications." Section 29-3B-3(D)-(E). All such policies must include

(1) having a blind administrator or blinded administrator perform the live lineup or photo lineup;

(2) documenting a description of the suspect provided by the eyewitness, including a description of the circumstances under which the

suspect was seen by the eyewitness, the time of day, the length of time the suspect was seen, the perceived or actual distance from the eyewitness to the suspect and the lighting conditions;

(3)     providing the eyewitness with instructions that minimize the likelihood of an inaccurate identification, including that the perpetrator may or may not be in the identification procedure and that the investigation will continue regardless of whether an identification is made;

(4)     composing the lineup so that the fillers generally resemble the eyewitness's description of the perpetrator so that the suspect does not unduly stand out from the fillers;

(5)     using at least four fillers in a live lineup and at least five fillers in a photo lineup;

(6)     ensuring, when practicable, that a photograph of the suspect used in a photo lineup is contemporary and resembles the suspect's appearance at the time of the offense;

(7)     presenting separate photo lineups and live lineups when there are multiple eyewitnesses, ensuring that the same suspect is placed in a different position for each identification procedure;

(8)     having the administrator seek and document a clear statement from the eyewitness, at the time of the identification and in the eyewitness's own words, as to the eyewitness's confidence level that the person identified is the person who committed the crime;

(9)     minimizing factors at any point in time that influence an eyewitness to identify a suspect or affect the eyewitness's confidence level in identifying a suspect, including verbal or nonverbal statements by or reactions from the administrator;

(10)     presenting lineup members one at a time;

(11)     adopting relevant practices shown to enhance the reliability of an eyewitness participating in a showup procedure, such as:

(a)     identifying the circumstances under which a showup is warranted;

(b)     transporting the eyewitness to a neutral, non-law enforcement location where the detained suspect is being held;

          (c)       removing the suspect from the law enforcement squad car;

          (d)       removing restraints from the suspect when the suspect is being observed by the eyewitness; and

          (e)       administering the showup procedure close in time to the commission of the crime;

      (12)   video recording the entirety of the photo lineup and live lineup and, where practicable, the showup procedure, unless the recording equipment is not reasonably available or the recording equipment fails and obtaining replacement equipment is not feasible; and

      (13)   preserving photographic documentation of all live lineup and photo lineup members and showup suspects, as well as all descriptions provided by the eyewitness of the perpetrator.

Section 29-3B-3(E).

**{68}**　　The nonexhaustive list of system variables set forth in Section 29-3B-3(E) represents a minimum standard of "objectivity and reliability" for the identification procedures used in lineups, showups, and photo arrays and is similar in content to comparable standards proposed or established by commentators, courts, and other statehouses. *See, e.g.*, Wise et al., *supra* at 485-97 (discussing guidelines for such system variables); *see Henderson*, 27 A.3d at 896-903 (discussing parameters for the New Jersey system variables), 919-22 (establishing system variables and procedures for lineups, showups, and photo arrays in New Jersey); *see also* N.C. Gen. Stat. § 15A-284.52(b) (2007) (establishing the system variables for photo and live lineups first taking effect in North Carolina on March 1, 2008 (amended effective December 1, 2015, and June 26, 2019)). By the express terms of the Act, the "objectivity and reliability" standards set out therein are prospective only, with law enforcement required to comply with those standards by January 1, 2020. Section 29-3B-3(A), (E).

**{69}**　　Finally, we note that the Act only speaks to the obligations of law enforcement agencies rather than the rights of suspects under investigation and provides no remedy in the event a given identification procedure is not administered in accordance with its requirements.

**7.     The *Manson* rule violates due process under the New Mexico Constitution**

**{70}**　　The Massachusetts and New York case authorities discussed in section 5 highlight the importance of judicial flexibility in addressing shortcomings in existing law that develop during changing times and by reason of evolving science. In the face of emergent scientific consensus on a given issue, blind adherence to outdated precedent is a failing. This is particularly the case in the constitutional realm and is no less so in

the context of eyewitness evidence where the risks of misidentification are great and the stakes including wrongful convictions are high.

**{71}** The frequent criticisms levelled against the *Manson* decision and its progeny from social scientists and legal scholars alike reveal serious flaws in the assumptions and premises underlying *Manson*. These criticisms are apt and compel us to conclude that the federal reliability standard set forth in *Manson* is both scientifically and jurisprudentially unsound and hence flawed under our interstitial review. *See generally State v. Rowell*, 2008-NMSC-041, ¶¶ 20-23, 25, 144 N.M. 371, 188 P.3d 95 (relying on legal literature and the case law of New Mexico and other states in rejecting an often-criticized federal constitutional doctrine in favor of a "sounder theory," one rooted in state constitutional principles); *see also State v. Garcia*, 2009-NMSC-046, ¶¶ 34, 35, 147 N.M. 134, 217 P.3d 1032 (rejecting a widely criticized United States Supreme Court opinion that weakened the right to be free from unreasonable searches and seizures "beyond a point which may be countenanced under our state constitution").

**{72}** We therefore join Massachusetts and New York in departing from the *Manson* rule and adopting in its place a per se rule of exclusion. In so doing, we overrule prior cases to the extent that they apply the *Manson* reliability standard to determine whether unnecessarily suggestive, police-arranged, pretrial identifications are nonetheless admissible. *See, e.g.*, *Patterson*, 2001-NMSC-013, ¶¶ 20-22, 25-26; *Jacobs*, 2000-NMSC-026, ¶¶ 30-32; *Baca*, 1983-NMSC-049, ¶¶ 15, 18-19.[5] We recognize that a scant few jurisdictions have chosen to entirely abandon the two-prong reliability test of *Manson* on state constitutional grounds.[6] Nonetheless, our ultimate interest is not with the number of courts that have weighed in on the issue but with the persuasiveness of their decisions. *See State v. Dickson*, 141 A.3d 810, 826-27 (Conn. 2016) (declining to adopt the view of "a number of courts" on a state constitutional issue involving first-time in-court identifications for which, the court concluded, "the arc of logic trumps the weight of authority"). The weight of authority supporting the continued use of the *Manson* rule must again yield to the arc of logic analyzed so insightfully by Justice Marshall in his dissent in *Manson.*

## 8.    The independent source doctrine

---

[5] Among the cases not directly affected by our ruling today is *State v. Ramirez*, which did not involve the use of any police-arranged, out-of-court identification procedures. *See* 2018-NMSC-003, ¶¶ 30-32, 409 P.3d 902.

[6] Besides Massachusetts and New York, only Wisconsin had at one time adopted a constitutionally based rule of exclusion with respect to unnecessarily suggestive eyewitness identifications, a rule limited in scope to the suppression of unnecessary out-of-court showups. *See State v. Dubose*, 2005 WI 126, ¶ 45, 699 N.W.2d 582. The *Dubose* rule was relatively short-lived, as the Wisconsin Supreme Court, over a two-justice dissent, recently abrogated the rule and returned to *Manson*'s two-step due process analysis. *See State v. Roberson*, 2019 WI 102, ¶ 3, 935 N.W.2d 813. The reasons for the Wisconsin court's recent about-face were disputed in *Roberson*, with the principal opinion taking the view that *Dubose* "was unsound in principle," particularly in its misplaced reliance on "social science research," 2019 WI 102, ¶¶ 37-44, 46 (Roggensack, C.J.), while the dissent maintained "that *Dubose* remains sound in principle and that it is only the composition of this court that has changed." *Id.* ¶ 98 (Dallet, J., dissenting)

**{73}** Pursuant to the independent source doctrine, an in-court identification which is independent of and not tainted by an out-of-court identification is admissible at trial. *See State v. Flores*, 2010-NMSC-002, ¶¶ 57, 60, 147 N.M. 542, 226 P.3d 641 (stating that pursuant to the independent source doctrine "the issue is whether the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime, or whether he is merely remembering the person he picked out in a pretrial procedure" (internal quotation marks and citation omitted)); *State v. Johnson*, 2004-NMCA-058, ¶ 27, 135 N.M. 567, 92 P.3d 13 (same); *see also* Garrett, *supra*, at 476-88 (construing the independent source doctrine through analysis of federal case law). Analysis of the theoretical underpinnings of the independent source doctrine demonstrates that the doctrine in the context of due process and eyewitness identification is legally and practically unsound. It is also scientifically unsound.

**{74}** From a legal perspective, as Garrett writes, the independent source doctrine "arises from a confusion of two lines of Supreme Court eyewitness identification cases" decided in the late 1960's and early 1970's. Garrett, *supra*, at 483. The first line of cases is rooted in Sixth Amendment right-to-counsel jurisprudence contained in *United States v. Wade*, 388 U.S. 218, 241-42 (1967), and in *Gilbert v. California*, 388 U.S. 263, 272-73 (1967). *See* Garrett, *supra*, at 483. *Wade*, 388 U.S. at 241-42, and *Gilbert*, 388 U.S. at 272-73, held that if a judge determines that a postindictment lineup resulting in an eyewitness identification was conducted in violation of a defendant's Sixth Amendment right to counsel, the in-court identification by the eyewitness is allowed nevertheless if the identification derives from a source independent of the illegal lineup. *See* Garrett, *supra*, at 483. However, these cases, Garrett argues, rely on "inapposite" Fourth Amendment precedent applying the independent source exception to evidence collected as a result of an illegal search or seizure, Garrett, *supra*, at 483; *see Wade*, 388 U.S. at 241 (relying on *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)); *Gilbert*, 388 U.S. at 272-73 (same), and "now ostensibly only appl[y] to Sixth Amendment violations of the right to counsel at postindictment lineups." Garrett, *supra*, at 483.

**{75}** The second line of cases consists of the Fourteenth Amendment due-process cases arising from *Manson*, 432 U.S. at 111-12, 114, which explicitly abandoned the independent source doctrine in favor of the current reliability standard for determining whether admission of an out-of-court eyewitness identification violates due process. Garrett, *supra*, at 483-85. Notwithstanding that the United States Supreme Court adopted the *Manson* standard, as Garrett explains, "some courts outright conflate the lines of cases and cite to *Wade* when they apply the 'independent source' rule in cases claiming due process (not Sixth Amendment) violations." Garrett, *supra*, at 485. This conflation of United States Supreme Court Sixth Amendment right-to-counsel jurisprudence with Fourteenth Amendment due-process jurisprudence misstates the Court's controlling precedent in *Manson* and, in application, serves to deprive defendants of a fair trial by permitting admission of highly prejudicial evidence on an unsound legal basis.

**{76}** Additionally, viewing the independent source doctrine from a practical and scientific perspective further highlights the danger of allowing an avenue for the state to

cure law enforcement misconduct in eliciting an eyewitness identification through suggestive identification procedures in cases where the identity of the perpetrator is in dispute. In this scenario, the effect of law enforcement identification procedures on the eyewitness's memory is crucial to a court's due process inquiry because, as we have already discussed, "eyewitness memory is highly malleable" and every attempt "to test an eyewitness's memory will reshape that memory." Garrett, *supra*, at 485. The likelihood that an eyewitness's memory will be permanently and irreconcilably reshaped is further compounded by law enforcement's use of suggestive identification procedures. *See id.* Specifically, where law enforcement employs suggestive identification procedures to elicit an identification from an eyewitness, the eyewitness subjected to the suggestive identification procedures becomes effectively incapable of accessing a memory of what the eyewitness saw that is independent of that procedure. *See id.* There is, consequently, nothing independent or reliable about an eyewitness's memory of events that has been reshaped and otherwise tainted by law enforcement's use of suggestive identification procedures.

**{77}** The independent source doctrine in the context of due process and disputed eyewitness identification evidence lacks legal justification and is contrary to the existing science. We hereby abandon the doctrine in the context of disputed eyewitness identifications.

**{78}** While we abandon the independent source doctrine for disputed eyewitness identifications, the doctrine has no applicability in cases where the eyewitness, such as a domestic violence victim, is personally familiar with the perpetrator of the crime. In such instances, therefore, the identification is admissible. We also observe that in such cases, it is highly unlikely either that the identity of the perpetrator will be in dispute or that a photo array or similar eyewitness identification procedure will be used by law enforcement to identify the perpetrator in the first place.

### 9. Elements of the per se rule of exclusion

**{79}** Under the per se exclusionary rule we adopt herein, if a witness makes an identification of a defendant as a result of a police identification procedure that is unnecessarily suggestive and conducive to irreparable misidentification, the identification and any subsequent identification by the same witness must be suppressed. The question of whether the identification is *unnecessarily* suggestive focuses not only on the identification procedure itself but also on whether the police have a *good reason* to use a suggestive identification procedure in the first instance. This rule in part mirrors the Massachusetts approach to the admission of eyewitness identification evidence. *See Johnson*, 45 N.E. 3d at 88; *Walker*, 953 N.E.2d at 205. Unlike the *Manson* rule that examines the "irreparable misidentification" question by purporting to assess the *reliability* of an eyewitness's account, *see* 432 U.S. at 116-17, our per se rule of exclusion looks to "the totality of the circumstances attending the [police/eyewitness] *confrontation* to determine whether it was unnecessarily suggestive," *see Silva-Santiago*, 906 N.E.2d at 310 (emphasis added) (internal quotation marks and citation omitted). Our approach also dovetails with that of Massachusetts in another respect; under both, the central question to be determined on

a motion to suppress identification testimony on due process grounds is "not whether the [eye]witness might have been mistaken, but whether any possible mistake was the product of improper suggestions by the police." *Commonwealth v. Watson*, 915 N.E.2d 1052, 1057 (Mass. 2009). We also join Massachusetts in concluding that due process violations stemming from unnecessarily suggestive identification procedures are amenable to harmless error review. *See Jones*, 666 N.E.2d at 999, 1001-02 (suppressing a pretrial identification on concluding that error in its admission was not "harmless beyond a reasonable doubt").

{80}   We depart, however, from the Massachusetts burden-of-proof framework, which requires a defendant alleging an unnecessarily suggestive eyewitness identification procedure "to prove, by a preponderance of the evidence, that the witness was subjected by the [s]tate to a pretrial confrontation . . . so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the defendant due process of law." *Silva-Santiago*, 906 N.E.2d at 310 (omission in original) (internal quotation marks and citation omitted). Under our approach, the initial burden falls on the accused to establish prima facie that some aspect of the identification procedure employed by the police was suggestive in nature. If the accused does not meet that burden, suppression is not required. However, if the accused demonstrates that the identification procedure contained one or more suggestive elements, the burden shifts to the state to prove by clear and convincing evidence *either* that (1) the procedure employed was not so suggestive as to materially taint the identification made by the eyewitness, which is to say that any departure from proper procedure could not have increased the risk of misidentification, *or* (2) good reason existed for the police to employ the suggestive procedure in the first instance. If the state fails to carry its responsive burden, the identification evidence and any subsequent in-court identification must be suppressed.

{81}   Our adoption of a clear and convincing standard for the state to meet its burden in these circumstances is grounded in the due process concerns so convincingly expressed in Justice Marshall's dissenting opinion in *Manson*, see 432 U.S. at 119-27 (Marshall, J., dissenting), and is intended to guard against the improper use of unnecessarily suggestive pretrial identification procedures whenever feasible. Further, our placement of the ultimate burden of persuasion on the prosecution to justify admission of suggestive identification evidence is borne from the reality that law enforcement agencies—as the administrators of identification procedures—not only "control[ ] the bulk of the evidence in that regard," *Lawson*, 291 P.3d at 689, but with due diligence and proper guidance can often avoid improperly importing suggestive practices into the identification procedures entrusted to them.

{82}   By our decision today, we only announce the broad contours of a new per se exclusionary rule for unnecessarily suggestive pretrial identification procedures and do not purport to fully address the myriad procedural and substantive questions that the rule's application may ultimately implicate.

## 10.   Requirement to use scientifically reliable protocols and procedures

**{83}** From what we have said, it is apparent that due process under the New Mexico Constitution requires law enforcement agencies to adopt and follow scientifically supported protocols and practices to minimize mistaken identifications. The legal literature reflects that while adopting a per se rule of exclusion is a major step forward in improving standards for evaluating eyewitness evidence, it is inadequate by itself to combat the misidentification problems inherent in the use of suggestive identification procedures. *See, e.g.*, Kahn-Fogel, *supra*, at 122-24. Critical to the proper working of this type of exclusionary rule, Professor Kahn-Fogel maintains, is its use in tandem with "scientifically supported guidance on the kinds of conduct that increase the odds of misidentification." *Id.* at 124.

**{84}** As discussed previously, our Legislature now requires law enforcement to comply with scientifically sound eyewitness identification "practices" or "protocols." Section 29-3B-3(C), (E). The Act by its terms regulates the methodology that must be used by law enforcement in administering identification procedures, and although it does not contain sanctions for impermissible police conduct, its provisions necessarily brush up against court practice and procedure. The Act is well-suited to serve as a litmus test for suggestiveness. Full compliance with the Act's specified identification protocols in a given case is sufficient to establish—absent countervailing defense evidence of the presence of other forms of suggestive police conduct—that the identification procedure at issue is not suggestive. On the other hand, agreeing with the Massachusetts approach to the issue, law enforcement's failure to follow one or more of the Act's protocols in a particular case, while supportive of a finding of suggestive police conduct, is not, standing alone, decisive of inadmissibility. *See Thomas*, 68 N.E.3d at 1169. That inquiry is best left for trial judges to answer in the first instance, on a case-by-case basis: whether the police identification procedure at issue was unnecessarily suggestive and conducive to mistaken identification.

## 11. Summary

**{85}** We hold that Article II, Section 18 of the New Mexico Constitution affords broader due process protection than the United States Constitution in the context of admission of eyewitness identification evidence. In conducting eyewitness identification procedures, law enforcement agencies are required to adopt and follow scientifically supported protocols and practices to minimize mistaken identification. In addition, our holding in this case implicates three aspects of eyewitness identification law in New Mexico.

**{86}** First, we adopt a new standard for determining whether eyewitness identification evidence is admissible at trial. Under the new standard, if a witness makes an identification of a defendant as a result of a police identification procedure that is unnecessarily suggestive and conducive to misidentification, the identification and any subsequent identification by the same witness must be suppressed. The question of whether the identification is "unnecessarily suggestive" focuses not only on the identification procedure itself but also on whether the police have a "good reason" to use a suggestive identification procedure in the first place.

**{87}** Second, we abandon as legally and practically unsound the independent source doctrine, which has been applied in New Mexico as stated in *Flores*, 2010-NMSC-002, ¶ 57, and in *Johnson*, 2004-NMCA-058, ¶ 27, to permit the admission of an in-court eyewitness identification if its source is ostensibly independent of an inadmissible out-of-court identification.

**{88}** Third, when a defendant files a pretrial motion to suppress eyewitness identification evidence, the initial burden is on the defendant to show some indication of suggestiveness in law enforcement's administration of the eyewitness identification procedure. Upon making this showing, the burden shifts to the state to prove by clear and convincing evidence that *either* (1) the procedure employed was not so suggestive as to materially taint the identification made by the eyewitness, which is to say that any departure from proper procedure could not have increased the risk of misidentification, *or* (2) good reason existed for the police to employ the suggestive procedure in the first instance. If the state fails to carry its responsive burden, the identification and any subsequent identification by the same witness must be suppressed.

## 12.    Suppression is not required

**{89}** We now determine the outcome of Defendant's motion to suppress under our new test. Again, an order denying suppression of eyewitness identification evidence is reviewed as a mixed question of fact and law, with the Court viewing the facts "in the manner most favorable to the prevailing party, and drawing all reasonable inferences in support of the court's decision." *Salgado*, 1999-NMSC-008, ¶ 16 (brackets omitted)(internal quotation marks and citation omitted). We review application of the law to those facts de novo. *See Neal*, 2007-NMSC-043, ¶ 15. Initially, Defendant was required to establish prima facie that some aspect of the identification procedure employed by Detective Jaramillo was suggestive in nature.

**{90}** Defendant's expert Dr. Malpass testified, as we have already related, that suggestive identification procedures can lead to changes in the memory of an eyewitness, ranging from entirely replacing the witness's memory to altering the witness's memory of particular features of the perpetrator. Dr. Malpass further explained that a suggestive out-of-court identification taints a subsequent in-court identification because the in-court identification stems from a contaminated memory. Dr. Malpass also testified generally that law enforcement agencies should apply "best practices" in administering photographic eyewitness identifications, which he said include (1) use of double-blind photo array presentations in which the administrator does not know either the identity of the suspect or the suspect's position in the photo array, (2) use of preidentification instructions, including that (a) the suspect may or may not be presented in the set of photographs, (b) the witness is not required to make an identification, and (c) the investigation will continue even if the witness does not make an identification, (3) use of sufficiently similar filler photographs so that the suspect's photograph does not stand out, and (4) elicitation of a "confidence statement" from the eyewitness regarding the eyewitness's degree of confidence in having chosen a perpetrator. However, Dr. Malpass expressed no opinion on whether, or to what extent, a failure to follow one or more of these "best practices" would result in an unnecessarily suggestive identification

procedure conducive to an irreparable identification. And, none of the testimony about these "best practices" was specifically related to the identification procedures in this case. Although Dr. Malpass was critical of some physical facial features of persons depicted in the photo array in comparison to Defendant's facial features, we have already explained that none of those distinctions were so remarkable or unique as to make one photograph stand out over any other in the group. In this regard, the district court made a specific finding that "all six individuals all appeared to be Hispanic, all in the same general age range, all had tattoos. Subject 2, as described by Dr. Malpass, had additional tattoos above his eyebrows."

**{91}** The evidence presented by Defendant failed to establish prima facie that some aspect of the identification procedure used by Detective Jaramillo was suggestive in nature. Because Defendant failed to meet this burden, suppression was not required.

## B. Admission of Evidence of the Allsup's Shooting

### 1. Evidence of prior bad acts

**{92}** Defendant argues that the district court erred in admitting speculative evidence concerning the Allsup's shooting as relevant to the issues of Defendant's identity as the perpetrator and his opportunity to access the murder weapon. The State responds that the evidence was properly admitted under Rule 11-404(B).

**{93}** "This Court reviews a district court's decision to admit evidence under Rule 11-404(B) and Rule 11-403 [NMRA] for an abuse of discretion." *State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* (internal quotations marks and citation omitted). "We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or unjustified by reason." *Id.*

**{94}** Rule 11-404(B)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). "The initial threshold for admissibility of prior uncharged conduct is whether it is probative on any essential element of the charged crime." *State v. Gallegos*, 2007-NMSC-007, ¶ 35, 141 N.M. 185, 152 P.3d 828 (internal quotation marks and citation omitted). "In other words, if a fact is wholly undisputed, the only additional probative value extrinsic-act evidence would have on that issue would be to show a person's propensity" and accordingly must be excluded. *Id.* "[T]he proponent of the evidence is required to identify and articulate the consequential fact to which the evidence is directed before it is admitted." *Id.* ¶ 22.

### 2. Opportunity and identity

**{95}** The standard for determining whether the opportunity exception to Rule 11-404(B)(1) applies has not been explicitly decided by New Mexico appellate courts. *See Gallegos*, 2007-NMSC-007, ¶ 35 ("Because of our holding, we do not use this case to divine the mystery of the 'opportunity' exception of Rule 11-404(B)."); *State v. Gallegos*, 2005-NMCA-142, ¶ 29, 138 N.M. 673, 125 P.3d 652 ("The 'opportunity' exception to the prohibition on evidence of other bad acts is something of a mystery." (internal quotation marks and citation omitted)), *rev'd on other grounds by Gallegos*, 2007-NMSC-007, ¶¶ 2-3; *see also State v. Hall*, 1987-NMCA-145, ¶¶ 42-43, 107 N.M. 17, 751 P.2d 701 (holding that if a trial court finds that evidence of opportunity is "relevant to a disputed issue other than . . . character," the evidence is admissible if the court determines it to be more probative than prejudicial).

**{96}** In *Gallegos*, noting that Rule 11-404 is "virtually identical" to Federal Rule of Evidence 404, our Court of Appeals in determining applicability of the opportunity exception to Rule 11-404(B)(1) utilized the standard used in the First Circuit Court of Appeals: "[T]o show opportunity is to show that the defendant had some special capacity, ability or knowledge that would enable him to commit the crime." *Gallegos*, 2005-NMCA-142, ¶ 29 (internal quotation marks omitted). (quoting *United States v. Maravilla*, 907 F.2d 216, 222 (1st Cir. 1990)). This standard is consistent with secondary-source discussions of the opportunity exception as well as with the standard applied in other circuits. *See* Charles A. Wright & Kenneth W. Graham Jr., 22B *Federal Practice and Procedure* § 5249 at 201 (2d ed. 2017) (stating that *opportunity* for purposes of Federal Rule of Evidence 404(b)(2) has been understood to mean "a person's physical or mental capacity to perform the act"); *see also United States v. Green*, 648 F.2d 587, 592 (9th Cir. 1981) (recognizing that the opportunity exception to Federal Rule of Evidence 404(b)(1) is intended to cover the category of evidence related to a defendant's capacity to carry out an act); *United States v. Goichman*, 547 F.2d 778, 781-82 (3d Cir. 1976) (determining that a previous instance in which an attorney accepted checks for a personal injury settlement and endorsed them to his stockbroker was relevant under the Federal Rules of Evidence Rule 404(b)(2) to show the attorney's opportunity for generating unreported income).

**{97}** At the hearing on the State's motion to admit evidence of the Allsup's shooting, the State established through the Allsup's surveillance footage and by Defendant's admission that he was present at the Allsup's during an argument that occurred between his friend and the Allsup's cashier that occurred at night prior to gunshots being fired at the store. The evidence showed that after the dispute, Defendant's friend told the cashier that he would be back to "get" him. Later that night after Defendant and his friend left the Allsup's, a vehicle drove by, and multiple gunshots were fired at the store. The forensic firearm toolmark evidence established that bullets from the Allsup's shooting and the shooting of Cisneros and AO were fired from the same gun.

**{98}** Taken together, the direct and circumstantial evidence from the Allsup's shooting gives rise to the inference that Defendant had access to the firearm used both to shoot at the Allsup's and to kill Cisneros and AO. Specifically, the evidence tends to show that either Defendant or his friend fired the gun at the Allsup's after his friend's confrontation with the Allsup's cashier, based on his friend's statement to the cashier that he would be

back to "get" the cashier and based on the fact that the bullet casings from the Allsup's shooting and homicide of Cisneros and AO matched. It was not unreasonable for the district court to conclude from this evidence that Defendant had the "special capacity" and "ability . . . that would enable him to" access the firearm used to kill Cisneros and AO. *See Gallegos*, 2005-NMCA-142, ¶ 29; *People v. Billington*, 323 N.W.2d 343, 348 (Mich. Ct. App. 1982) (determining that the district court did not err in admitting evidence of the defendant's prior act of breaking and entering, where the defendant admitted to participating in the prior offense, in order to establish the defendant's opportunity to access the weapon used in the homicide). Therefore, the district court reasonably ruled that the evidence of the Allsup's shooting was relevant under the opportunity exception to Rule 11-404(B).

**{99}** The same evidence, however, does not meet the requirements for relevance under the identity exception to Rule 11-404(B)(1). "The identity exception to Rule 11-404(B)(1) may be invoked when identity is at issue and when the similarity of the other crime demonstrates a unique or distinct pattern easily attributable to one person." *State v. Peters*, 1997-NMCA-084, ¶ 14, 123 N.M. 667, 944 P.2d 896 (brackets omitted) (internal quotation marks and citation omitted). "In determining whether a unique or distinct pattern has been demonstrated, our focus is on the similarities between the two offenses, because those similarities establish an inference of identity which is necessary for relevance." *Id.* ¶ 19. Aside from the firearm toolmark evidence indicating that the bullets from the Allsup's shooting and shooting of Cisneros and AO were fired from the same gun, there were no other similarities between the Allsup's shooting and the homicide of Cisneros and AO that tended to show a distinct pattern easily attributable to one person.

**{100}** These circumstances stand in contrast to cases in which the courts have determined the evidence supported a finding that other-act evidence was relevant under the identity exception to Rule 11-404(B)(1). *See Peters*, 1997-NMCA-084, ¶¶ 15, 20 (determining that similarities between two attacks permitted the inference of a pattern for purposes of the identity exception to Rule 11-404(B)(1) where both victims were elderly Caucasian women who lived alone, both were raped, both described their attacker as a short and small-framed dark man with body odor, both were tied up and had cloth placed over their heads after the assault, and in both cases the attacker demanded the victims' purses before leaving); *State v. Allen*, 1978-NMCA-054, ¶¶ 5-6, 91 N.M. 759, 581 P.2d 22 (determining that similarities between two attacks permitted the inference of a pattern for purposes of the identity exception to Rule 11-404(B)(1) where both victims were abducted at knife point near the same shopping center, both victims wore glasses and were told shortly after being abducted to remove their glasses, the abductor told each victim he would use the knife if she tried to escape, the abductor required each victim to remove her bra and to perform fellatio while he was driving, and the abductor told each victim he wanted to rape her).

**{101}** Because the district court reasonably concluded that the evidence of the Allsup's shooting was admissible under Rule 11-404(B)(2) as relevant evidence of Defendant's opportunity to access the murder weapon, we must also review the district court's conclusion that the evidence was also admissible under Rule 11-403. *See Bailey*, 2017-

NMSC-001, ¶ 15. Rule 11-403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." For purposes of Rule 11-403, the term unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Bailey*, 2017-NMSC-001, ¶ 16 (internal quotation marks and citation omitted). "Evidence is unfairly prejudicial if it is best characterized as sensational or shocking, provoking anger, inflaming passions, or arousing overwhelmingly sympathetic reactions, or provoking hostility or revulsion or punitive impulses, or appealing entirely to emotion against reason." *Id.* (internal quotation marks and citation omitted). Because a determination of unfair prejudice is fact-sensitive, much deference is given to district court judges to fairly weigh probative value against probable dangers. *See id.*

**{102}** Defendant argues that even if this Court concludes the evidence of the Allsup's shooting was admissible under an exception to Rule 11-404(B)(1), the probative value of the evidence was outweighed by its "unfairly prejudicial force." Specifically, Defendant asserts that "nothing beyond speculation . . . tied [Defendant] to the Allsup's shooting" and the evidence "was highly prejudicial, both because of the violent nature of the offense and the risk for confusion and speculation" that "because he or [his friend] shot at the occupied Allsup's store, [Defendant] likely shot [Cisneros] and [AO]" as well. We disagree.

**{103}** The district court reasonably ruled that the probative value of the evidence of the Allsup's shooting was not substantially outweighed by the risk of prejudice. As the State asserts in ruling that the evidence of the Allsup's shooting was admissible, the district court ordered that the parties prepare a limiting instruction on how the evidence should be considered, stating that the evidence was being introduced for the limited purpose of proving identity and opportunity. The evidence was admitted at trial, and a limiting instruction was prepared and given in compliance with this order stating,

> Evidence has been admitted concerning other acts, *to wit*: an incident concerning the discharge of a weapon at the Allsup[']s store . . . on September 4, 2014. This evidence has been admitted for the limited purpose of proving identity or opportunity in relation to the crimes charged. This evidence should be considered only in so far as you may determine that the charged conduct and the Allsup[']s incident may be connected.

**{104}** The district court's limiting instruction minimized, if not dispelled, the potential of undue prejudice to Defendant through speculation or jury confusion by the admission of the Allsup's shooting evidence. Specifically, the instruction required the jury to make a two-step determination in weighing the value of the evidence. The instruction required the jury to first determine whether the Allsup's shooting and homicide of Cisneros and AO were connected, and if so, then the evidence could be considered only as proof of the identity or opportunity of Defendant to commit the charged crime. *See State v. Woodward*, 1995-NMSC-074, ¶¶ 30-31, 121 N.M. 1, 908 P.2d 231 (determining that the district court did not err in admitting evidence under Rule 11-404(B) on grounds that the

probative value outweighed the risk of unfair prejudice where the district court gave a limiting instruction that the jury could consider the evidence only for the purpose of determining whether the defendant had the motive to murder the victim), *rev'd on other grounds by Woodward v. Williams*, 263 F.3d 1135, 1142-43 (10th Cir. 2001). Because the evidence cannot be otherwise fairly characterized as sensational, shocking, inflammatory, or appealing entirely to emotion against reason, the district court reasonably ruled that Rule 11-403 did not require exclusion of the Allsup's shooting evidence.

**{105}** Because (1) the district court reasonably concluded that the Allsup's shooting evidence was relevant as probative of Defendant's opportunity to access the firearm used to kill Cisneros and AO and (2) the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice, we conclude that the district court did not abuse its discretion in ruling the evidence was admissible.

## C.     Exclusion of Cisneros's Statement to Mirna

**{106}** Defendant argues that the district court erred in excluding, as inadmissible hearsay under Rule 11-804(B)(3)(b) for lack of corroborating evidence, Mirna's statement against interest concerning a statement Cisneros made to her. In so doing, Defendant asserts, the district court deprived him of his constitutional right to present a defense.

**{107}** "A defendant's right to present evidence on his own behalf is subject to his compliance with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *State v. Sanders*, 1994-NMSC-043, ¶ 26, 117 N.M. 452, 872 P.2d 870 (internal quotation marks and citation omitted);*see State v. Rosales*, 2004-NMSC-022, ¶ 7, 136 N.M. 25, 94 P.3d 768 (stating that "state rules of evidence do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve") (internal quotation marks and citation omitted)). "Our traditional rules of . . . hearsay are designed to ensure reliability in the fact-finding process and are not arbitrary or disproportionate to this legitimate purpose." *Rosales*, 2004-NMSC-022, ¶ 8.

**{108}** Hearsay "[m]eans a statement that (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Rule 11-801(C) NMRA. "Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court or by statute." Rule 11-802 NMRA. Rule 11-804(B)(3) provides that the statement of an unavailable witness is excepted from exclusion as hearsay when

> (a) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability, and

(b) [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

**{109}** In assessing the corroborating circumstances of a statement against interest, New Mexico appellate courts consider six factors:

(1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

*State v. Urias*, 1999-NMCA-042, ¶ 7, 127 N.M. 75, 976 P.2d 1027 (internal quotation marks and citation omitted).

**{110}** The district court reasonably excluded Cisneros's statement to Mirna under Rule 11-804(B)(3)(b). As stated previously, Defendant sought to elicit testimony from Mirna that two weeks prior to his death Cisneros told her, "I stole money from that mechanic you used to go to," and Cisneros also showed her cash and drugs, including marijuana and cocaine. Although this statement, in which Cisneros apparently admitted that he had stolen money and possessed illegal drugs, had a tendency to expose Cisneros to criminal liability if communicated to law enforcement, the district court concluded that the proffered corroborating evidence was insufficient to meet the statement against interest exception to the rule against hearsay.

**{111}** Analysis of the *Urias* factors is largely unhelpful in this case. When Cisneros made the alleged statement to Mirna, there was no indication whether he had admitted guilt to stealing the money or possessing the drugs referenced in the statement. There was no evidence proffered regarding Cisneros's motive in making the statement to Mirna or whether the statement was repeated. The only individual to whom Cisneros apparently made the statement was Mirna, Cisneros's sister. Without additional evidence to consider, the district court was left (as is this Court) to consider the nature and strength of the independent evidence relevant to the conduct in question.

**{112}** The only independent evidence that Defendant put forward relevant to the conduct in question was Detective Jaramillo's testimony that the mechanic at issue, Gilbert Serrano, told Detective Jaramillo that there had been a large sum of money stolen from his home. However, as the district court observed, this evidence lacked any detail regarding what was actually stolen from whom, by whom the property was stolen, and when the theft occurred. Under these circumstances, the district court reasonably ruled that Cisneros's alleged statement to Mirna was unsupported by corroborating circumstances clearly indicating its trustworthiness under Rule 11-804(B)(3)(b). Therefore, the district court did not abuse its discretion in excluding Cisneros's alleged

statement to Mirna as failing to meet the statement against interest exception to the rule against hearsay. *See State v. Benavidez*, 1999-NMSC-041, ¶ 4, 128 N.M. 261, 992 P.2d 274 (stating that the admission of evidence under the exception to the rule against hearsay for statements against penal interest is reviewed for abuse of discretion); *see also State v. Suazo*, 2017-NMSC-011, ¶ 9, 390 P.3d 674 ("An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize the ruling as clearly untenable or not justified by reason." (brackets omitted) (internal quotation marks and citation omitted).

**{113}**  Even assuming the district court erred in excluding Mirna's statement, any such error was harmless. *See State v. Hnulik*, 2018-NMCA-026, ¶ 24, 458 P.3d 475 (stating that errors in the admission of evidence are reviewed for nonconstitutional harmless error and that nonconstitutional error "is harmless when there is no reasonable probability that the error affected the verdict" (brackets omitted) (internal quotation marks and citation omitted)). As stated previously, Defendant argues that exclusion of Cisneros's statement to Mirna deprived him of his right to present the defense that individuals other than Defendant had a motive to kill Cisneros. This argument, however, overlooks that the district court expressly permitted Defendant to question Mirna "as to what she observed" when Cisneros made the statement to her and that Defendant could "argue based on the existence of those drugs, and her observation of them, and the cash that was available" that "Cisneros was involved in some way in the drug trade, and that there were other individuals that may be wanting to harm him." Consistent with the district court's ruling, Mirna took the stand and testified that in the weeks prior to his death, Cisneros showed her cocaine, marijuana, and cash. Furthermore, in closing, Defendant argued to the jury that evidence was presented showing that individuals other than Defendant had the motive to kill Cisneros.

**{114}**  Under these circumstances, Defendant was not deprived of the defense and, in fact, through his examination of Mirna and in closing argument, pursued his theory of the case that individuals other than Defendant had the motive to kill Cisneros. There was therefore no reasonable probability that the district court's exclusion of Cisneros's statement to Mirna affected the jury's verdict. Accordingly, we conclude that the district court did not abuse its discretion or otherwise err in excluding Cisneros's alleged statement to Mirna.

### D.   The District Court's Denial of Defendant's Proffered Instruction on Informant Testimony

**{115}**  Defendant argues that the district court erred in declining to give his requested instruction on informant testimony considering the particularly unreliable nature of Montoya's trial testimony. The State responds that the district court correctly declined to give Defendant's proffered instruction because (1) it was superfluous, (2) it was not based on a uniform jury instruction, and (3) it lacked impartiality. We agree.

**{116}**  "The propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Baroz*, 2017-NMSC-030, ¶ 13, 404 P.3d 769 (internal

quotation marks and citation omitted). In proffering the instruction on informant testimony based on the Tenth Circuit Criminal Pattern Jury Instruction 1.14, Defendant preserved his jury instruction challenge. Review is therefore for reversible error. *Baroz*, 2017-NMSC-030, ¶ 13.

**{117}** "Ordinarily, a defendant is not entitled to a specific instruction where the jury has already been adequately instructed upon the matter by other instructions." *State v. Venegas*, 1981-NMSC-047, ¶ 9, 96 N.M. 61, 628 P.2d 306. New Mexico appellate courts have also repeatedly recognized that a district court does not err in refusing to give additional instructions on witness credibility where the district court gives UJI 14-5020. *See State v. Ortega*, 1991-NMSC-084, ¶ 72, 112 N.M. 554, 817 P.2d 1196 (concluding that where all of the defendant's proffered instructions concerned witness credibility, witness bias and hostility, witness interest in outcome of the case, testimony of accomplices called by the state, immunity of the state's witnesses, and the plea agreement entered into with witnesses or codefendants, the district court did not err in denying such instructions where it gave UJI 14-5020), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶¶ 17-18, 148 N.M. 381, 237 P.3d 683; *State v. Gallegos*, 1993-NMCA-046, ¶¶ 10-11, 115 N.M. 458, 853 P.2d 160 (concluding that district court did not err in rejecting the defendant's tendered instruction that would have focused the jury's attention on the reliability of an eyewitness's identification where the court gave UJI 14-5020); *State v. Hogervorst*, 1977-NMCA-057, ¶ 60, 90 N.M. 580, 566 P.2d 828 (concluding that the district court's refusal to give various instructions tendered by the defendant concerning the credibility of certain witnesses was not error, where the district court gave the jury the general uniform jury instruction on witness credibility). Additionally, jury instructions that give "undue emphasis to the [d]efendant's theory of the case" are improper. *State v. Sanders*, 2000-NMSC-032, ¶ 23, 129 N.M. 728, 13 P.3d 460. Commentary on the evidence is "implicitly" inappropriate in a jury instruction and "is a matter that should be left for argument." *State v. Padilla*, 1977-NMCA-055, ¶ 13, 90 N.M. 481, 565 P.2d 352.

**{118}** As we have stated, in light of Montoya's testimony concerning Defendant's alleged admission to shooting Cisneros and AO, Defendant proffered a jury instruction on informant testimony modeled after the Tenth Circuit Criminal Pattern Jury Instruction 1.14. While the proffered instruction was not included in the record, Defendant asserts that the instruction provided the following:

> An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.

> You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

*See* Tenth Circuit Criminal Pattern Jury Instruction 1.14 (2014, updated 2018) However, as we have already stated, the jury was given an instruction modeled after UJI 14-5020 concerning witness credibility.

**{119}** In light of these facts, there was no error in refusing Defendant's instruction on informant testimony for the three reasons argued by the State. First, because the jury was given an instruction modeled after UJI 14-5020, the jury was adequately instructed on the issue of evaluation of witness credibility. As the State asserts, Defendant's informant testimony instruction was "superfluous" where the jury was instructed pursuant to UJI 14-5020 to "take into account the witness's truthfulness or untruthfulness" and to consider "any interest, bias or prejudice the witness may have" in the case. Second, Defendant's proffered instruction was based on a "[n]on-[u]niform [j]ury [i]instruction" inconsistent with New Mexico law. *See State v. Smith*, 1975-NMCA-139, ¶¶ 21-22, 27, 88 N.M. 541, 543 P.2d 834 (stating that decisions of the Tenth Circuit supporting the giving of instructions on particular categories of witness credibility "do not reflect New Mexico law" and that such instructions "should not be given unless required by statute or rule of court"). Finally, the refused instruction lacked impartiality as it directed the jury to "weigh an informant's testimony with greater care than the testimony of an ordinary witness." This instruction would have had the effect of placing extra emphasis on Montoya's testimony and Defendant's theory of the case that Montoya lacked credibility——an issue of commentary on the evidence properly left to closing argument. *See State v. Hornbeck*, 2008-NMCA-039, ¶¶ 26, 27, 143 N.M. 562, 178 P.3d 847 (concluding that the defendant in a prosecution for fraud was not entitled to a jury instruction stating that a debtor-creditor relationship with a subsequent failure to repay the loan does not itself constitute fraud because the statement "was a matter to be argued to the jury, rather than included in a jury instruction").

## III.    CONCLUSION

**{120}** We affirm the judgment and sentence of the district court.

**{121}  IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Chief Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**JUDITH K. NAKAMURA, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**